James E. Cecchi
Lindsey H. Taylor
CARELLA, BYRNE, CECCHI,
OLSTEIN, BRODY & AGNELLO
5 Becker Farm Road
Roseland, New Jersey 07068
(973) 994-1700

Scott A. Bursor
BURSOR & FISHER, P.A.
369 Lexington Avenue, 10th Floor
New York, New York 10017
(212) 989-9113

Nadeem Faruqi
Shane Rowley
Juan E. Monteverde
Francis McConville
FARUQI & FARUQI, LLP
369 Lexington Avenue, 10th Floor
New York, New York 10017
(212) 983-9330

*Counsel for Plaintiff*

# UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| NISSIM BOTTON, On Behalf of himself and All Others Similarly Situated,<br><br>Plaintiff,<br><br>v.<br><br>NESS TECHNOLOGIES, INC., AHARON FOGEL, AJIT BHUSHAN, SATYAM C. CHERUKURI, SASHI GERLITZ, P. HOWARD EDELSTEIN, GABRIEL EICHLER, DAN S. SUESSKIND, MORRIS WOLFSON, CITI VENTURE CAPITAL INTERNATIONAL, JERSEY HOLDING CORPORATION, AND JERSEY ACQUISITION CORPORATION,<br><br>Defendants. | Case No.<br><br>(Securities Class Action)<br><br>CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS AND FOR BREACHES OF FIDUCIARY DUTIES<br><br>**JURY TRIAL DEMANDED** |

Plaintiff, Nissim Botton ("Plaintiff"), by and through his attorneys, alleges upon information and belief, except to paragraph 12 which is alleged upon personal knowledge, as follows:

<u>**SUMMARY OF THE ACTION**</u>

1.      This is both an individual action and a shareholder class action brought by Plaintiff on behalf of holders of the common stock of Ness Technologies, Inc. ("Ness" or the "Company") to enjoin the acquisition of the publicly owned shares of Ness common stock by Citi Venture Capital International ("CVCI"), through its affiliates Jersey Holding Corporation, ("Jersey Holding") and Jersey Acquisition Corporation, a wholly-owned subsidiary of Jersey Holding, which CVCI or its affiliates do not already own, in an all cash transaction valued at approximately $307 million (the "Proposed Transaction").

2.      On June 10, 2011, Ness announced that the Company had signed a definitive agreement in which CVCI will acquire all of the outstanding shares of Ness ("Merger Agreement").  Under the terms of the Merger Agreement, Ness stockholders will receive $7.75 per share in cash for each share of common stock they hold.

3.      In pursuing the plan to induce Ness shareholders to approve the Proposed Transaction, each of the defendants violated applicable state law by directly breaching and/or aiding the other defendants' breaches of their fiduciary duties of loyalty, due care, diligence, good faith and fair dealing, independence, and candor.

4.      The Proposed Transaction is unfair and undervalued. Indeed, according to Thomson/First Call, at least one financial analyst values Ness common stock at $8.00 per share and both the mean and median Wall Street analyst target price is $7.88 per share, which is above

the $7.75 per share Ness's Board of Directors (the "Board") has accepted as adequate consideration for the Proposed Transaction.

5.　　Based upon the fact that CVCI owns 9.6% of the outstanding stock of Ness and has a designee on the Board, namely defendant Ajit Bhushan ("Bhushan"), CVCI is well aware of Ness's intrinsic enterprise value.  Knowing that the economy and the Company's performance is recovering, CVCI recognized that it had an opportunity to cash in on Ness's undervalued stock price by acquiring the Company before it felt the full effects of the economic turnaround and reached analyst targets.  As such, CVCI, in possession of non-public information regarding Ness, is taking advantage of its position to acquire the Company at a substantial discount to its true value.  More troubling is that Ness's Board is allowing CVCI to buy the Company on the cheap.

6.　　To ensure the success of the Proposed Transaction, Ness's Board locked up the deal in favor of CVCI by agreeing to impermissible "deal-protection" devices, effectively rendering the Proposed Transaction a *fait d'accompli*.  For example, the Board agreed to: (i) a "no-shop" provision that prevents the Company from negotiating with or providing confidential Company information to competing bidders except under extremely limited circumstances; (ii) a "matching rights" provision that allows CVCI three (3) business days to match any competing proposal in the unlikely event that one emerges; and (iii) a $8.35 million termination fee to be paid to CVCI if the Board agrees to a competing proposal.  These terms are particularly egregious since a bidder identified in the Proxy only as "Bidder D" had previously entered into an exclusivity agreement which provided that any merger agreement would contain a thirty (30) day "go shop" period and a termination fee of only $3 million.  Defendants' however, refused to continue negotiations with Bidder D, forgoing the more favorable merger provisions in order to enter into the Merger Agreement with CVCI, which already owned a substantial stake in the

Company and which had a designee on the Board.  As result, on June 27, 2011, the Ness Special

Committee received a letter from Bidder D claiming violations of its exclusivity agreement and

confidentiality agreement with Ness and reserving its rights and remedies arising from such

alleged breaches.

       7.     Similarly, in an attempt to induce shareholder approval of the unfair Proposed

Transaction, Defendants caused to be filed with the Securities and Exchange Commission

("SEC") a false and misleading Proxy Statement on Schedule 14, on June 30, 2011 (the "Proxy

Statement") for the required vote by Ness shareholders.  The Proxy Statement is false and

misleading in that it misstates and/or fails to disclose material information concerning, inter alia,

the sales process leading to the Proposed Transaction including specific details regarding why

the Board chose to abandon negotiations with Bidder D and why Bidder D is accusing Ness of

violating its exclusivity agreement and confidentiality agreement. Furthermore, the Proxy

Statement omits certain material projections for Ness, including free cash flows, as well as key

inputs in the analyses performed by Jefferies & Company, Inc. (Financial Advisor to the Special

Committee) and Merrill Lynch, Pierce, Fenner & Smith Incorporated (Financial Advisor to the

Board). These material misstatements and omissions contained in the Proxy Statement constitute

violations of Sections 14(a) and 20(a) of the Securities Exchange Act of 1934 ("Exchange Act")

as well as violations of breach of fiduciary duties owed by the Board to Ness shareholders.

       8.     For these reasons and as set forth in detail herein, Plaintiff seeks to enjoin

Defendants (defined below) from taking any steps to consummate the Proposed Transaction or,

in the event the Proposed Transaction is consummated, recover damages resulting from the

Individual Defendants' (defined below) violations of their fiduciary duties of loyalty, good faith,

due care, and full and fair disclosure.

## JURISDICTION AND VENUE

9.     This Court has jurisdiction over all claims asserted herein pursuant to 28 U.S.C §1331 in that Plaintiff's claims arise in part under the Constitution and laws of the United States, including the Exchange Act [15 U.S.C. §78aa] and 28 U.S.C. §1331.   This Court also has supplemental jurisdiction pursuant to 28 U.S.C. §1367(a).

10.     This Court also has jurisdiction over this action pursuant to 28 U.S.C. §§ 1332(a), (c), and (d) as Plaintiff and the defendants are citizens of and domiciled in different states and the amount in controversy exceeds $75,000, exclusive of interests and costs.   Given that the Proposed Transaction is valued at $307 million, the injunctive relief sought herein will exceed a sum or value of $75,000.   This action is not a collusive one to confer jurisdiction on this Court.

11.     Venue is proper in this Court pursuant to 28 U.S.C. §1391 because one or more of the defendants, including Ness, either resides in or maintains executive offices in this District, and a substantial portion of the transactions and wrongs that are the subject of this complaint occurred in substantial part in this District.   Finally, the defendants have received substantial compensation in this District by doing business here and engaging in numerous activities that had an effect in this District.

## THE PARTIES

12.     Plaintiff Nissim Botton is, and at all relevant times was, a continuous stockholder of defendant Ness.

13.     Defendant Ness Technologies, Inc. ("Ness") is a Delaware corporation headquartered in Tel Aviv, Israel, and New Jersey, with its U.S. headquarters located at 300 Frank W. Burr Boulevard, 7th Floor, Teaneck, New Jersey 07666.   Ness is a global provider of IT and business services and solutions with specialized expertise in software product engineering; and system integration, application development, consulting and software distribution.   Ness

delivers its portfolio of solutions and services using a global delivery model combining offshore, near-shore and local teams.  Ness common stock publicly trades on the NASDAQ Global Select ("NASDAQ") under the symbol "NSTC."

14.     Defendant Aharon Fogel ("Fogel") has served as a member and Chairman of the Board since 1999.

15.     Defendant Bhushan has served as a member of the Board since September 2009. Defendant Bhushan is a managing director at CVCI, where he has served since 2001.

16.     Defendant Satyam C. Cherukuri ("Cherukuri") has served as a member of the Board since October 2004 and as its Interim Chairman since February 2011.  Defendant Cherukuri served as Vice Chairman of the Board from December 2010 through January 2011.

17.     Defendant Sashi Gerlitz ("Gerlitz") has served as President and Chief Executive Officer ("CEO") of Ness since March 2007 and as a member of the Board since February 2007.

18.     Defendant P. Howard Edelstein ("Edelstein") has served as a member of the Board since June 2008.

19.     Defendant Gabriel Eichler ("Eichler") has served as a member of the Board since December 2008.  Defendant Eichler is the senior partner of Benson Oak, an investment banking and private equity firm operating in central Europe which he founded in 1991.

20.     Defendant Dan S. Suesskind ("Suesskind") has served as a member of the Board since October 2004.

21.     Defendant Morris Wolfson ("Wolfson") is the founder of the Company and has served as a member of the Board since its inception in 1999.

22.     Defendants in paragraph 14 through 21 are collectively referred to hereinafter as the "Individual Defendants."

23.     Each of the Individual Defendants herein is sued individually, and as an aider and abettor, as well as in his or her capacity as an officer and/or director of the Company, and the liability of each arises from the fact that he or she has engaged in all or part of the unlawful acts, plans, schemes, or transactions complained of herein.

24.     Defendant CVCI is a leader in global emerging markets private equity investing, and currently manages over $7 billion in equity investments and committed capital with its headquarters located at 399 Park Avenue, New York, New York 10022.   CVCI has an internationally integrated investment team with over 45 professionals worldwide with a local presence in Singapore, Mumbai, New Delhi, Hong Kong, London, New York and Santiago. CVCI-advised funds have made significant investments in Business Services and Cross-Border Outsourcing companies in the industry. Over the last decade, funds and entities advised by CVCI have invested in business services and Information Technology ("IT") Services companies in China, the U.S., India, Mexico, and Korea.

25.     Defendant Jersey Holding is a Delaware corporation and an affiliate of CVCI with its headquarters at 399 Park Avenue, New York, New York 10022.

26.     Defendant Jersey Acquisition Corporation ("Merger Sub") is a Delaware corporation and a direct wholly owned subsidiary of Jersey Holding.

27.     CVCI, Jersey Holding and Merger Sub are collectively referred to herein as "CVCI."

28.     Collectively, the Individual Defendants, Ness, and CVCI are referred to herein as the "Defendants."

## THE FIDUCIARY DUTIES OF THE INDIVIDUAL DEFENDANTS

## UNDER STATE LAW

29.    By reason of the Individual Defendants' positions with the Company as officers and/or directors, said individuals are in a fiduciary relationship with Plaintiff and the other shareholders of Ness and owe Plaintiff and the other members of the Class (defined herein) the duties of good faith, fair dealing, loyalty and full and candid disclosure.

30.    By virtue of their positions as directors and/or officers of Ness, the Individual Defendants, at all relevant times, had the power to control and influence, and did control and influence and cause Ness to engage in the practices complained of herein.

31.    Each of the Individual Defendants is required to act in good faith, in the best interests of the Company's shareholders and with such care, including reasonable inquiry, as would be expected of an ordinarily prudent person.  In a situation where the directors of a publicly traded company undertake a transaction that may result in a change in corporate control, the directors must take all steps reasonably required to maximize the value shareholders will receive rather than use a change of control to benefit themselves, and to disclose all material information concerning the proposed change of control to enable the shareholders to make an informed voting decision.  To diligently comply with this duty, the directors of a corporation may not take any action that:

(a)    adversely affects the value provided to the corporation's shareholders;

(b)    contractually prohibits them from complying with or carrying out their fiduciary duties;

(c)    discourages or inhibits alternative offers to purchase control of the corporation or its assets;

(d)    will otherwise adversely affect their duty to search for and secure the best value reasonably available under the circumstances for the corporation's shareholders; or

(e)     will provide the directors and/or officers with preferential treatment at the expense of, or separate from, the public shareholders.

32.     Plaintiff alleges herein that the Individual Defendants, separately and together, in connection with the Proposed Transaction, violated duties owed to Plaintiff and the other shareholders of Ness, including their duties of loyalty, good faith and independence, insofar as they, *inter alia*, engaged in self-dealing and obtained for themselves personal benefits, including personal financial benefits, not shared equally by Plaintiff or the other shareholders of Ness common stock.

## CLASS ACTION ALLEGATIONS

33.     Plaintiff brings the Exchange Act claims on behalf of himself individually. Plaintiff brings the state law claims pursuant to Rule 23 on behalf of himself and as a class action, on behalf of all holders of Ness common stock who are being and will be harmed by Defendants' actions described below (the "Class").   Excluded from the Class are Defendants herein and any person, firm, trust, corporation or other entity related to or affiliated with any of the Defendants.

34.     This action is properly maintainable as a class action because:

A.     The Class is so numerous that joinder of all members is impracticable.  As of April 29, 2011, there were over 38.1 million shares of Ness common stock issued and outstanding.   The actual number of public shareholders of Ness will be ascertained through discovery;

B.     There are questions of law and fact which are common to the Class, including *inter alia,* the following:

(i)     whether the Individual Defendants have breached their fiduciary duties of undivided loyalty, independence or due care with respect to Plaintiff and

the other members of the Class in connection with the Proposed Transaction;

(ii)     whether the Individual Defendants have breached their fiduciary duty to secure and obtain the best price reasonable under the circumstances for the benefit of Plaintiff and the other members of the Class in connection with the Proposed Transaction; and

(iii)     whether Plaintiff and the other members of the Class would suffer irreparable injury were the Proposed Transaction complained of herein consummated; and

C.     Plaintiff is an adequate representative of the Class, has retained competent counsel experienced in litigation of this nature and will fairly and adequately protect the interests of the Class;

D.     Plaintiff's claims are typical of the claims of the other members of the Class and Plaintiff does not have any interests adverse to the Class;

E.     The prosecution of separate actions by individual members of the Class would create a risk of inconsistent or varying adjudications with respect to individual members of the Class which would establish incompatible standards of conduct for the party opposing the Class; and

F.     Defendants have acted on grounds generally applicable to the Class with respect to the matters complained of herein, thereby making appropriate the relief sought herein with respect to the Class as a whole.

## SUBSTANTIVE ALLEGATIONS

### A.    Background

35.    Ness is a global provider of information technology, or IT, and business services and solutions with specialized expertise in software product engineering; system integration, application development, consulting and software distribution. The primary industries, or verticals, the Company serves include high-tech companies and independent software vendors, or ISVs; utilities and public sector; financial services; defense and homeland security; and life sciences and healthcare.  Ness has operations in North America, Europe, Israel and India, serving customers in over 20 countries.

36.    Ness provides services to over 500 clients located throughout the world, including a number of Fortune 1000 and Global 2000 companies. Ness has achieved recurring revenues from multi-year contracts and long-standing relationships with clients such as Chordiant (Pegasystems), the Czech Office for Surveying, Mapping and Cadastre, Komercní Banka, Israel Aircraft Industries, Israel's Ministry of Defense, Kaiser Permanente, Lockheed Martin, NAVTEQ, Quintiles, Standard & Poor's and Telefónica O2.

37.    The Company's revenues have grown from $161.4 million in 2002 to $571.8 million in 2010, representing a compound annual growth rate of approximately 17%, while results of operations have improved from net income from continuing operations of $0.7 million for 2002 to $30.5 million for 2008.  In 2009, the Company recognized a net loss from continuing operations of $10.0 million, primarily as a result of severance, restructuring and related project costs incurred in the fourth quarter of 2009 as Ness reorganized, reduced, sold or closed selected smaller operations that were unprofitable or that the Company determined were not strategic to its planned future operations and growth.   These strategic initiatives produced immediate

benefits to the Company's financial performance, as in 2010, Ness reported that net income from continuing operations improved to $8.4 million.

38.     This highly favorable financial performance continued into 2011.  For example, on January 31, 2011, the Company announced that its Software Product Labs business unit had signed an extension of its development contract with NAVTEQ, the leading global provider of maps, traffic and location-data-enabling navigation, location-based services and mobile advertising around the world.  The Company reported that the new three year deal extends and expands the large global development center in Košice, Slovakia.

39.     Commenting on this development contract with Ness, Amreesh Modi ("Modi"), Chief Technology Officer and Executive Vice President, NAVTEQ, stated, in relevant part:

> We are extremely pleased with the level of technical excellence and results the Ness team has delivered over the past three years. Ness' Košice center provides us with the right mix of skills and resources to meet our requirements for high quality, creativity and innovation. We look forward to our continued collaboration.

40.     Similarly, on February 14, 2011, Ness announced that its defense and homeland security business unit had signed a $16 million contract to provide a training and simulation system to a foreign country's national command and control center.  The Company reported that the solution will be based on Ness' sophisticated Integrated Command and Control System, which Ness implemented for the purchasing country beginning in May 2008, and a simulation product.

41.     Michael Zinderman, President, Ness Technologies and Systems Group, commented on the $16 million contract, stating, in relevant part:

> Following the very successful implementation and deployment of its national command and control center, the foreign country's ministry of defense is beginning a strong proactive training process, utilizing the training and simulation

system. Our dedicated ICCS trainer and simulation system significantly enhances the performance and decision making process of officers in real life situations.

42.     Again, on March 15, 2011, the Company announced that it won another contract – this one with Barclays Capital, the investment banking division of Barclays Bank PLC, to establish an Israel Development and Engineering Center.  The Company reported that the center will provide technology development and engineering services.  The contract is expected to be worth more than $75 million over five years.

43.     Commenting on the Barclays contract, Defendant Gerlitz stated:

We are pleased to partner with Barclays Capital on this significant initiative to establish a software development and engineering center in Israel. During the course of the engagement, we will contribute our knowledge and expertise in building and managing software development labs. We will employ our unique software development methodology, taking good advantage of Israel's pool of high quality engineering talent.

44.     On April 13, 2011, the Company announced it was awarded another $17.3 million engagement from Israel Electric Corporation to implement SAP-based projects, including software testing.  In announcing the contract, Effi Kotek, President of Ness Israel boasted:

We will provide IEC, which is a strategic client, with our extensive experience and expertise in the utilities industry, including experts from Israel as well as from our subsidiaries in Eastern Europe, where we routinely conduct similarly complex projects for European utilities companies.  IEC's selection of Ness for these important projects underscores our position as Israel's leading SAP systems integrator and implementer.

45.     Based upon the strategic initiatives adopted by the Company in 2009, as well as the new contracts awarded to the Company, Ness's financial prospects are extremely promising. On February 2, 2011, the Company announced financial results for its fourth quarter and full year, ended December 31, 2010.  Ness reported that quarterly revenues were a record $157.4 million, up 16% year-over-year; and full year revenues were $571.8 million, up 12% year-over-year.  The Company further reported quarterly operating income of $7.3 million, compared to a

loss of $11.3 million in the fourth quarter of 2009; and full year operating income of $16.4 million, up from $0.3 million in 2009.  Moreover, the Company reported that on a non-GAAP basis, quarterly operating income was $10.1 million, up 87% year-over-year; and full year operating income was $27.7 million, up 11% year-over-year.  Furthermore, on both a GAAP and non-GAAP basis, the Company reported that quarterly operating income and operating margin improved sequentially, reaching the highest levels achieved in nine quarters.

46.     Defendant Gerlitz, commenting on the Company's fourth quarter and full year financial results, stated:

> We had a good fourth quarter and I am particularly proud of the operating margin expansion we delivered; this steady progress is a direct result of our strategy to focus on differentiation, global offerings and higher-margin revenue streams. *As we continue our long-term priority to maximize margin expansion in 2011, we feel that we are on a solidly upward trajectory with a good outlook for the coming year.*

47.     Similarly, Ofer Segev ("Segev"), Ness's Executive Vice President and CFO, credited the Company's financial performance in 2010 to the strategic initiatives adopted by Ness in 2009 and 2010, stating:

> *We are pleased by the major recovery we implemented in 2010, as seen in our strong fourth quarter numbers, which speak for themselves.* We will continue to focus on excelling in our operations, driving to increase the bottom line, generate good operating cash flows and maintain our strong liquidity.

48.     Then, on May 4, 2011, Ness announced financial results for its first quarter, ended March 31, 2011.  The Company reported that revenues were $137.3 million, up 3% year-over-year; and operating income was $6.9 million, up 186% year-over-year.  The Company stated that, on a non-GAAP basis, operating income was $8.9 million, up 79% year-over-year. Additionally, on a GAAP and non-GAAP basis, the Company reported that operating margin improved sequentially, reaching the highest levels in ten quarters.  Further, the Company stated

that net income from continuing operations was $4.2 million, up 497% year-over-year.  Based upon these results, the Company Ness reiterated its full year 2011 guidance for revenues from continuing operations in the range of $595 million to $605 million, up from the $571 million in revenues reported for 2010.

49.     Commenting on these first quarter 2011 results and the success of the Company's strategic initiatives, Defendant Gerlitz stated:

> We had a good first quarter and I am very proud of the continued operating margin expansion we delivered. Our steady progress improving operating margins is a direct result of record first quarter results in Israel as well as ongoing improvement in Central and Eastern Europe. ***We are making excellent headway on the strategic integration of our business units into one global entity***, as manifested by our recent landmark contract with Barclays Capital. ***We are confident about the year ahead, and look forward to further improvements in our results.***

50.     Rather than permitting the Company's shares to continue to trade freely and allowing its public shareholders to reap the benefits of the Company's strategic initiatives and integration which were already producing increasingly positive financial results and poised the Company for "further improvements" in the coming year, the Individual Defendants have acted for their own benefit and the benefit of CVCI, and to the detriment of the Company's shareholders, by entering into the Merger Agreement.  The Individual Defendants effectively capped Ness's price at a time when the Company's stock was overcoming the effects of the lingering economic recession and when it was poised to capitalize on its positive and encouraging financial outlook.

**B.      The Proposed Transaction**

51.     On June 10, 2011, Ness issued a press release announcing the Proposed Transaction which stated:

**Teaneck, NJ – June 10, 2011** – Ness Technologies, Inc. (NASDAQ: NSTC and TASE: NSTC), a global provider of information technology solutions and services, announced today that the company has entered into a definitive merger agreement under which an affiliate of Citi Venture Capital International (CVCI), a global private equity investment fund, will acquire the company in an all-cash transaction valued at approximately $307 million.

Under the terms of the agreement, Ness stockholders will receive $7.75 per share in cash for each share of common stock they hold, representing a premium of 17.6% over the closing price of the company's shares on the Nasdaq Global Select Market on June 9, 2011, the last trading day prior to today's announcement, or 22.2% over the average closing price of the company's shares over the 30 trading days prior to June 10, 2011.

The company's Board of Directors, acting upon the unanimous recommendation of a Special Committee of disinterested members of the company's Board of Directors, approved the transaction as being in the best interests of Ness Technologies and its stockholders and recommends that the company's stockholders approve the transaction.

"We believe this transaction provides attractive value for our stockholders and represents an exciting opportunity for Ness, our over-500 customers and our 6,900 employees to continue our growth and development in partnership with CVCI," said Sachi Gerlitz, president and CEO, Ness Technologies. "We look forward to completing the transaction and continuing to provide superior solutions and services to our strong customer base, as we build upon our leadership position in our markets and continue to implement our strategic plan."

"We are excited about the prospect of increasing our investment in Ness," said Bob Khanna, CVCI's Managing Director. "Ness is the leader in several segments of the IT services marketplace, serves the most sophisticated global clients and has an outstanding reputation for delivering complex projects. We look forward to working with management, employees and partners of all business units to ensure that Ness becomes even more valuable to its clients and fully leverages the strengths of its global network."

P. Howard Edelstein, Chairman of the Special Committee, said: "After a thorough assessment, we concluded that the transaction with CVCI delivers significant value and is in the best interest of our stockholders."

The transaction is subject to certain closing conditions, including approval of the company's stockholders, antitrust regulatory approvals and other customary closing conditions. Ness's stockholders will be asked to vote on the proposed transaction at a special meeting that will be held on a date to be announced. Ness expects the transaction to be completed in the next three to six months.

Jefferies & Company, Inc. is acting as financial advisor to the Special Committee, and managed the process for the Special Committee soliciting bids from both strategic and financial sponsors in response to an unsolicited indication of interest. BofA Merrill Lynch is acting as financial advisor to the Board of Directors of Ness. Citigroup Global Markets Inc. is acting as financial advisor to CVCI. Olshan Grundman Frome Rosenzweig & Wolosky LLP is acting as legal advisor to Ness, Ropes & Gray LLP is acting as legal advisor to the Special Committee and Cleary Gottlieb Steen & Hamilton LLP is acting as legal advisor to CVCI.

52.     The Proposed Transaction is unfair and undervalued. Indeed, according to Thomson/First Call, at least one financial analyst values Ness common stock at $8.00 per share and both the mean and median analyst target price is $7.88 per share, which is above the $7.75 per share Ness's Board has accepted as adequate consideration for the Proposed Transaction. Interestingly, Ness refused to continue to negotiate in good faith with competing bidders, such as the bidder identified in the Proxy as Bidder D, even though Bidder D offered far more favorable terms under a merger agreement which would provide a 30 day "go shop" period and a termination fee of just $3 million, compared to the termination fee of over $8 million agreed to in the Merger Agreement with CVCI.  Instead of negotiating with Bidder D, the Board agreed to sell the Company to CVCI, where fellow Board member defendant Bhushan was a managing director.

53.     In addition, certain of the Individual Defendants will receive lavish compensation, benefits or change of control and severance benefits.  First, while no formal agreements have been negotiated or executed, it is expected certain of the Individual Defendants and other key members of the Company's management will continue their employment with the Company following the consummation of the Proposed Transaction.  Moreover, in the midst of negotiating the terms of the Proposed Transaction and Merger Agreement, certain of the Individual Defendants and other members of the Company's management negotiated transition incentive

bonuses and other incentives to remain with the Company through the consummation of the Proposed Transaction.

54.    For example, defendant Gerlitz alone is in line to receive $ 2,075,783 upon a change of control, even though he expects to continue his employment and lavish compensation after the consummation of the Proposed Transaction.

55.    Moreover, under the terms of the Merger Agreement, all unvested stock options and restricted stock units will immediately vest and will entitle the holders to immediate payment of the consideration offered in the Proposed Transaction.  Pursuant to these terms, Defendant Gerlitz alone will receive $654,247 for his unvested equity awards, and the directors as a group will received over $775,000 collectively for their unvested equity awards and more than $1.3 million in total consideration for their equity holdings.

**C.    The Preclusive Deal Protection Devices**

56.    As part of the Merger Agreement, the Individual Defendants agreed to certain onerous and preclusive deal protection devices that operate conjunctively to make the Proposed Transaction a *fait accompli* and ensure that no competing offers will emerge for the Company.

57.    First, the Merger Agreement contains a strict "no shop" provision prohibiting the members of the Ness's Board from taking any affirmative action to comply with their fiduciary duties to maximize shareholder value, including soliciting alternative acquisition proposals or business combinations.  Specifically, §5.3(a) of the Merger Agreement precludes the Board and any Company personnel from attempting to procure a price in excess of the amount offered by CVCI.

58.    Similarly, §5.3(d) of the Merger Agreement provides a matching rights provision whereby the Company must notify Ness of any unsolicited competing bidder's offer within 24

hours. Then, if and only if the Board determines that the competing offer constitutes a "Superior Offer," Ness is granted three business days to amend the terms of the Merger Agreement to make a counter-offer that the Company must consider in determining whether the competing bid still constitutes a "Superior Offer."

59.     Thus, even if the Ness Board receives an intervening bid that appears to be "superior" to CVCI's offer, they are precluded from even entering into discussions and negotiations unless they first reasonably determine in good faith that the alternative proposal is, in fact, "superior," and give CVCI three business days to match the competing offer. Consequently, this provision prevents the Ness Board from exercising their fiduciary duties and precludes an investigation into competing proposals unless, as a prerequisite, the majority of the Ness Board first determines that the proposal is "superior."

60.     In addition to the no-shop and matching rights provisions, the Proposed Transaction Agreement includes a $8.35 million termination fee that in combination will all but ensure that no competing offer will be forthcoming.

61.     These provisions are even more egregious in that the Board refused to continue to negotiate in good faith with Bidder D which had agreed to the terms of a merger agreement that would have provided a 30 day "go shop" period, and a modest termination fee of just $3 million. Indeed, Ness's apparent disapproval of any merger with Bidder D is the result of the conflicts of interest arising out of the fact that defendant Bhushan – a fellow Board member – is a managing director of CVCI.

62.     These provisions cumulatively discourage bidders from making a competing bid for the Company.

63.     Accordingly, Plaintiff seeks injunctive and other equitable relief to prevent the irreparable injury that Company shareholders will continue to suffer absent judicial intervention.

**D.      The Materially Misleading And/Or Incomplete Proxy Statement**

64.     In order to secure shareholder approval of this unfair deal, Defendants filed with the SEC a materially misleading and incomplete Proxy Statement.  The Proxy Statement, which recommends that Ness shareholders vote in favor of the Proposed Transaction, omits and/or misrepresents material information about the unfair sale process, the unfair consideration, and the true intrinsic value of the Company.   Specifically, the Proxy Statement omits/or misrepresents the material information set forth below in contravention to Sections 14(a) and 20(a) of the Exchange Act.

65.     The Proxy Statement fails to provide the Company's shareholders with material information and/or provides them with false and materially misleading information thereby rendering the shareholders unable to cast an informed vote regarding the Proposed Transaction.

66.     The Proxy Statement does not describe in sufficient detail the sales process leading up to the Proposed Transaction or the flaws that might have permeated the sales process. For example, the Proxy fails to provide an adequate explanation as to why the Board chose to abandon negotiations with Bidder D and instead rejected any further consideration of its proposal and more troubling why Bidder D is accusing Ness of violating its exclusivity agreement and confidentiality agreement and the specific accusations made by Bidder D in its letter dated June 27, 2011, which is not attached to the Proxy Statement.

67.     Moreover, the analyses in support of the fairness opinion prepared by Jefferies & Company, Inc. ("Jefferies") who acted as the financial advisor to the Special Committee, is plagued by materially false statements and omissions.  The opinion of Jefferies fails to disclose

information which would allow shareholders to intelligently determine whether or not they should vote in favor of the Proposed Transaction.  In particular, the Proxy Statement is deficient and should provide, *inter alia*, the following:

A.   In the *Selected Companies Analysis*, (a) the criteria to select the companies and multiples used as well as multiples observed for each of the selected companies; (b) the selected reference ranges applied to the Company's EBITDA and EPS for its trailing 12 months  as well as calendar years 2011 and 2012 in the analysis. In fact, the analysis only discloses conclusory statements by showing the implied per share equity value for the different multiples without showing a fair summary of the analysis;

B.   In the *Selected Transactions Analysis*, (a) the rationale for selecting companies used; (b) the multiples observed for each of the selected transactions; (c) the selected reference ranges applied to the Company's 12 months trailing EBITDA. In fact, the analysis only discloses conclusory statements by showing the implied per share equity value and suffers the same infirmities as the analysis above by failing to show a fair summary of the analysis; and

C.   In the *Discounted Cash Flow Analysis*, (a) the definition of "free cash flows"; and (b) the rationale for selecting an exorbitant discount rate of 12% to 13% and EBITDA terminal growth rates of 2% to 4% in the analysis. Moreover, the analysis is silent as to whether stock based compensation was considered and how it was allocated in the analysis;

68.     Furthermore, the analyses in support of the fairness opinion prepared by Merrill Lynch, Pierce, Fenner & Smith Incorporated ("BofA Merrill Lynch") who acted as financial advisor to the Board, is plagued by materially false statements and omissions.  The opinion of BofA Merrill Lynch suffers similar infirmities as the Jefferies analyses and fails to disclose information which would allow shareholders to intelligently determine whether or not they should vote in favor of the Proposed Transaction.  In particular, the Proxy Statement is deficient and should provide, *inter alia*, the following:

A.      In the *Selected Companies Analysis*, (a) the criteria to select the companies and multiples used as well as multiples observed for each of the selected companies; (b) the selected reference range is disclosed here but it fails to explain it selection process to use 5.0x to 6.5x for 2011 EBITDA and 8.5 to 11.0x for 2012 EBITDA. Furthermore, the analysis discloses conclusory statements by showing the implied per share equity value for the different multiples but it is an incomplete analysis since it failed to show a fair summary of the analysis;

B.      In the *Selected Transactions Analysis*, (a) the rationale for selecting companies used; (b) the multiples observed for each of the selected transactions; (c) the selected reference range is disclosed here but it fails to explain it selection process to use 6.5x to 9.0x for LTM EBITDA and 5.0x to 7.5x for NTM EBITDA. Furthermore, the analysis discloses conclusory statements by showing the implied per share equity value for the different multiples but it is an incomplete analysis since it failed to show a fair summary of the analysis;

C.    In the *Discounted Cash Flow Analysis*, (a) the definition of "free cash flows"; and (b) the rationale for selecting an exorbitant discount rate of 13.5% to 15.5% and the terminal values used in the analysis. Moreover, the analysis is silent as to whether stock based compensation was considered and how it was allocated in the analysis;

69.    Moreover, while the Proxy Statement discloses certain Company projections at page 48, it fails to disclose Ness' unlevered free cash flows or even the key inputs necessary to reach free cash flows, which are critical to understanding the basis for those projections as well as the projections for years 2011-2015 used by both Jefferies and BofA Merrill Lynch in its analyses.

70.    The information requested above in paragraphs 66-69collectively amounts to the key inputs necessary for one to be able to evaluate and understand the sales process and analysis rendered in connection with the Proposed Transaction.  Therefore, the aforementioned omitted information is highly relevant and material to Ness shareholders.

71.    Accordingly, because the foregoing process and material misstatements and/or omissions represent a violation of state law and federal law, Plaintiff seeks injunctive and other equitable relief to prevent the irreparable injury that Company shareholders and he will continue to suffer absent judicial intervention.

**COUNT ONE**

**On Behalf of Plaintiff for Violations of Section 14(a) of the Exchange Act
Against the Individual Defendants and Ness**

72.    Plaintiff brings this Exchange Act claim on behalf of himself as an individual.

73.    Plaintiff incorporates each and every allegation set forth above as if fully set forth herein.

74.     Defendants have issued the Proxy Statement with the intention of soliciting shareholder support for the Proposed Transaction.

75.     Rule 14a-9, promulgated by the SEC pursuant to Section 14(a) of the Exchange Act, provides that such communications with shareholders shall not contain "any statement which, at the time an in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading."  17 C.F.R. §240.14a-9.

76.     Specifically, the Proxy Statement violates Section 14(a) and Rule 14a-9 because it omits material facts, including those set forth above.  Moreover, in the exercise of reasonable care, Defendants should have known that the Proxy Statement is materially misleading and omits material facts that are necessary to render it non-misleading.

77.     The misrepresentations and omissions in the Proxy Statement are material to Plaintiff, who will be deprived of his entitlement to cast a fully informed vote if such misrepresentations and omissions are not corrected prior to the vote on the Proposed Transaction. As a direct and proximate result of Defendants' conduct, Plaintiff will be irreparably harmed.

## COUNT TWO

**On Behalf of Plaintiff for Violations of Section 20(a) of the Exchange Act
Against the Individual Defendants and Ness**

78.     Plaintiff brings this Exchange Act claim on behalf of himself as an individual.

79.     Plaintiff incorporates each and every allegation set forth above as if fully set forth herein.

80.     The Individual Defendants acted as controlling persons of Ness within the meaning of Section 20(a) of the Exchange Act as alleged herein.  By virtue of their positions as officers and/or directors of Ness, and participation in and/or awareness of the Company's

operations and/or intimate knowledge of the false statements contained in the Proxy Statement filed with the SEC, they had the power to influence and control and did influence and control, directly or indirectly, the decision making of the Company, including the content and dissemination of the various statements which Plaintiff contends are false and misleading.

81.     Each of the Individual Defendants and Ness were provided with or had unlimited access to copies of the Proxy Statement and other statements alleged by Plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

82.     In particular, each of the Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company, and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the securities violations alleged herein, and exercised the same. The Proxy Statement at issue contains the unanimous recommendation of each of the Individual Defendants to approve the Proposed Transaction. They were, thus, directly involved in the making of this document.

83.     Ness also had direct supervisory control over the composition of the Proxy Statement and the information disclosed therein, as well as the information that was omitted and/or misrepresented in the Proxy Statement. Ness, in fact, disseminated the Proxy Statement and is, thus, directly responsible for materially misleading shareholders because it permitted the materially misleading Proxy Statement to be published to shareholders.

84.     In addition, as the Proxy Statement sets forth at length, and as described herein, the Individual Defendants and Ness were each involved in negotiating, reviewing, and approving the Proposed Transaction. The Proxy Statement purports to describe the various issues and

information that the Individual Defendants reviewed and considered.  The Individual Defendants and Ness participated in drafting and/or gave their input on the content of those descriptions.

85.     By virtue of the foregoing, the Individual Defendants and Ness have violated Section 20(a) of the Exchange Act.

86.     As set forth above, the Individual Defendants and Ness had the ability to exercise control over and did control a person or persons who have each violated Section 14(a) and SEC Rule 14a-9, by their acts and omissions as alleged herein.   By virtue of their positions as controlling persons, these defendants are liable pursuant to Section 20(a) of the Exchange Act. As a direct and proximate result of Defendants' conduct, Plaintiff will be irreparably harmed.

## COUNT THREE

### On Behalf of Plaintiff and the Class for Breach of Fiduciary Duties
### Against the Individual Defendants

87.     Plaintiff repeats and realleges each allegation set forth herein.

88.     The Individual Defendants have violated fiduciary duties of care, loyalty, candor and good faith owed to public shareholders of Ness.

89.      By the acts, transactions and courses of conduct alleged herein, the Individual Defendants, individually and acting as a part of a common plan, are attempting to unfairly deprive Plaintiff and other members of the Class of the true value of their investment in Ness.

90.     As demonstrated by the allegations above, the Individual Defendants failed to exercise the care required, and breached their duties of loyalty, good faith, candor and independence owed to the shareholders of Ness because, among other reasons, they failed to take steps to maximize the value of Ness to its public shareholders.

91.     The Individual Defendants dominate and control the business and corporate affairs of Ness, and are in possession of private corporate information concerning Ness's assets,

business and future prospects.  Thus, there exists an imbalance and disparity of knowledge and economic power between them and the public shareholders of Ness which makes it inherently unfair for them to benefit their own interests to the exclusion of maximizing shareholder value.

92.     Moreover, the Individual Defendants have failed to fully disclose to Plaintiff and the Class all material information necessary to make an informed decision regarding the Proposed Transaction.

93.      By reason of the foregoing acts, practices and course of conduct, the Individual Defendants have failed to exercise ordinary care and diligence in the exercise of their fiduciary obligations toward Plaintiff and the other members of the Class.

94.     As a result of the actions of the Individual Defendants, Plaintiff and the Class will suffer irreparable injury in that they have not and will not receive their fair portion of the value of Ness's assets and businesses and have been and will be prevented from obtaining a fair price for their common stock.

95.      Unless the Individual Defendants are enjoined by the Court, they will continue to breach their fiduciary duties owed to Plaintiff and the members of the Class, all to the irreparable harm of the members of the Class.

96.      Plaintiff and the members of the Class have no adequate remedy at law.  Only through the exercise of this Court's equitable powers can Plaintiff and the Class be fully protected from the immediate and irreparable injury which the Individual Defendants' actions threaten to inflict.

## COUNT FOUR

**On Behalf of Plaintiff and the Class
Against Ness and CVCI for Aiding and
Abetting the Individual Defendants' Breaches of Fiduciary Duty**

97.     Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

98.     Ness and CVCI have acted and are acting with knowledge of, or with reckless disregard to, the fact that the Individual Defendants are in breach of their fiduciary duties to Ness's public shareholders, and have participated in such breaches of fiduciary duties.

99.     Ness and CVCI knowingly aided and abetted the Individual Defendants' wrongdoing alleged herein.  In so doing, Ness and CVCI rendered substantial assistance in order to effectuate the Individual Defendants' plan to consummate the Proposed Transaction in breach of their fiduciary duties.

100.    Plaintiff has no adequate remedy at law.

**WHEREFORE**, Plaintiff prays for relief and judgment as follows:

A.      Determining that this action is a proper class action and certifying the case under Rule 23 of the Federal Rules of Civil Procedure;

B.      Declaring and certifying Plaintiff as a class representative;

C.      Enjoining Defendants, their agents, counsel, employees and all persons acting in concert with them from consummating the Proposed Transaction, unless and until the Company adopts and implements a procedure or process to obtain a Proposed Transaction agreement providing the best possible terms for shareholders;

D.      Rescinding, to the extent already implemented, the Proposed Transaction or any of the terms thereof, or granting Plaintiff and the Class rescissory damages;

28

E.      Directing the Individual Defendants to account to Plaintiff and the Class for all damages suffered as a result of the Individual Defendants wrongdoing;

F.      Awarding Plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and the costs and disbursements of this action; and

G.      Such other and further relief as this Court may deem just and proper.

Dated:  July 7, 2011                     /s/ James E. Cecchi_____
                                         James E. Cecchi
                                         CARELLA, BYRNE, CECCHI,
                                         OLSTEIN, BRODY & AGNELLO
                                         5 Becker Farm Road
                                         Roseland, New Jersey 07068
                                         (973) 994-1700

FARUQI & FARUQI, LLP
Nadeem Faruqi
Shane Rowley
Juan E. Monteverde
Francis McConville
369 Lexington Avenue, 10th Floor
New York, New York 10017
(212) 983-9330

BURSOR & FISHER, P.A.
Scott A. Bursor
369 Lexington Avenue, 10th Floor
New York, New York 10017
(212) 989-9113

*Counsel for Plaintiff*

## **JURY TRIAL DEMANDED**

Plaintiff hereby demands a trial by jury of all issues so triable.

Dated:  July 7, 2011                              /s/ James E. Cecchi_____
                                                            James E. Cecchi
                                                            CARELLA, BYRNE, CECCHI,
                                                            OLSTEIN, BRODY & AGNELLO
                                                            5 Becker Farm Road
                                                            Roseland, New Jersey 07068
                                                            (973) 994-1700


FARUQI & FARUQI, LLP
Nadeem Faruqi
Shane Rowley
Juan E. Monteverde
Francis McConville
369 Lexington Avenue, 10th Floor
New York, New York 10017
(212) 983-9330

BURSOR & FISHER, P.A.
Scott A. Bursor
369 Lexington Avenue, 10th Floor
New York, New York 10017
(212) 989-9113

*Counsel for Plaintiff*