**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

| | |
|---|---|
| NISSIM BOTTON, On Behalf of himself and All Others Similarly Situated,<br><br>Plaintiff,<br><br>v.<br><br>NESS TECHNOLOGIES, INC., AHARON FOGEL, AJIT BHUSHAN, SATYAM C. CHERUKURI, SASHI GERLITZ, P. HOWARD EDELSTEIN, GABRIEL EICHLER, DAN S. SUESSKIND, MORRIS WOLFSON, CITI VENTURE CAPITAL INTERNATIONAL, JERSEY HOLDING CORPORATION, and JERSEY ACQUISITION CORPORATION,<br><br>Defendants. | Civil Action No. 11-3950(SRC) |

---------------------------------------------------------------------------------------------------------------

**PLAINTIFF'S BRIEF IN SUPPORT OF**
**APPLICATION FOR EXPEDITED DISCOVERY**
**AND SCHEDULE FOR PRELIMINARY INJUNCTION HEARING**

---------------------------------------------------------------------------------------------------------------

James E. Cecchi
Lindsey H. Taylor
CARELLA, BYRNE, CECCHI,
OLSTEIN, BRODY & AGNELLO
5 Becker Farm Road
Roseland, New Jersey 07068
(973) 994-1700

Scott A. Bursor
BURSOR & FISHER, P.A.
369 Lexington Avenue, 10th Floor
New York, New York 10017
(212) 989-9113

*Counsel for Plaintiff*

Nadeem Faruqi
Shane Rowley
Juan E. Monteverde
Francis McConville
FARUQI & FARUQI, LLP
369 Lexington Avenue, 10th Floor
New York, New York 10017
(212) 983-9330

## TABLE OF CONTENTS

Table Of Authorities ............................................................................................................ii

Preliminary Statement ..........................................................................................................1

Factual Background ..............................................................................................................3

      A.    Ness' Bright Prospects For The Future.......................................................3

      B.    The Proposed Acquisition...........................................................................6

      C.    The Proxy Is Materially Deficient And Incomplete ..................................8

Legal Argument

Plaintiff Requests Expedited Discovery And Preliminary Injunction Schedule .............11

      a)    The Inadequate Disclosures In the Preliminary Proxy Statement
            Are Material Under Delaware Law...........................................................11

            1)    Free Cash Flow for Ness Must Be Disclosed .............................13

            2)    Key Inputs for Jefferies and
                BofA Merrill Lynch's Analyses Must Be Disclosed ...................15

            3)    Details of the Sales Process ........................................................16

      b)    Shareholders Will Suffer Significant
            And Irreparable Injury Without Adequate Disclosures ...........................17

      c)    The Harm to Shareholders Outweighs
            Any Hypothetical Harm To Defendants Or Any Third Parties ...............18

Conclusion .........................................................................................................................20

# TABLE OF AUTHORITIES

**Cases**

*also State of Wisconsin Inv. Bd. v. Bartlett*, 2000 Del. Ch. LEXIS 22 (Del. Ch. Feb. 9, 2000)... 18
*Arnold v. Soc'y for Sav. Bancorp., Inc.*, 650 A.2d 1270 (Del. 1994) ............................... 12, 13, 16
*Freedman v. Restaurant Assocs. Indus., Inc.,* 1990 Del. Ch. LEXIS 142 (Sept. 19, 1990) ......... 12
*Gilmartin v. Adobe Resources Corp.*, 1992 Del. Ch. LEXIS 80 (Del. Ch. Apr. 6, 1992); ........... 17
*In re Anderson, Clayton S'holders Litig.*, 519 A.2d 669 (Del. 1986) ................................... 18
*In re Netsmart Technologies, Inc. S'holders Litig.,* 924 A.2d 171 (Del. Ch. 2007).................... 13
*In re Netsmart Techs., Inc. S'holders Litig.*, 924 A.2d 171 (Del. Ch. 2007).............. 11, 16, 18, 19
*In re PNB Holding Co. S'holders Litig.*, 2006 Del. Ch. LEXIS 158 (Del. Ch. Aug. 18, 2006)... 13
*In re Pure Res. S'holders Litig.,* 808 A.2d 421 (Del. Ch. 2002) ..................................... 15, 16, 17
*In re Pure Resources, Inc. S'Holders Litig,* 808 A.2d 421 (Del. Ch. 2002)........................... 12, 13
*In re Staples, Inc. S'holders Litig.*, 792 A.2d 934 (Del. Ch. 2001) ..................................... 14, 18
*Joseph v. Shell Oil Co.*, 482 A.2d 335 (Del. 1984) ..................................................... 17
*Laidlaw Acquisition Corp. v. Mayflower Group, Inc.*, 636 F. Supp. 1513 (S.D. Ind. 1986)........ 17
*Malone v. Brincat*, 722 A.2d 5 (Del. 1998) ............................................................... 16
*Maric Capital Master Fund, Ltd. v. Plato Learning, Inc.*, 11 A.3d 1175 (Del. Ch. 2010) ......... 14
*McMillan v. Intercargo Corp.*, 768 A.2d 492 (Del. Ch. 2000)........................................... 17
*McMullin v. Beran*, 765 A.2d 910 (Del. 2000) ............................................................ 12
*Michigan Citizens for an Indep. Press v. Thornburgh*,
     1988 U.S. Dist. LEXIS 16576 (D.D.C. Aug. 17, 1988) ............................................ 17
*ODS Techs., L.P. v. Marshall*, 832 A.2d 1254 (Del. Ch. 2003) ....................................... 17
*Phototron Corp. v. Eastman Kodak Co.*, 687 F. Supp. 1061 (N.D. Tex. 1988) ..................... 17
*Rosenblatt v. Getty Oil Co.*, 493 A.2d 929 (Del. 1985) ................................................. 12
*Shell Petroleum, Inc. v. Smith*, 606 A.2d 112 (Del. 1992)............................................... 12
*Stroud v. Grace*, 606 A.2d 75 (Del. 1992) ............................................................... 12
*TSC Indus. v. Northway, Inc.*, 426 U.S. 438 (1976) ..................................................... 12
*Wayne County Emples. Ret. Sys. v. Corti*, 954 A.2d 319 (Del. Ch. 2008) ........................... 11

## PRELIMINARY STATEMENT

Plaintiff Nissim Botton ("Plaintiff") submits this application seeking expedited discovery and a schedule for the filing of a preliminary injunction application pursuant to Fed.R.Civ.P. 65(a) with respect to the upcoming shareholder vote relating to the proposed acquisition of Ness Technologies, Inc. ("Ness" or the "Company") by Citi Venture Capital International, through its affiliates (collectively, "CVCI"). The individual Defendants herein are the members of the Ness Board of Directors. An expedited discovery schedule is necessary because of the time frame involved in soliciting shareholder approval of the acquisition via what Plaintiffs believes to be a proxy statement which includes inadequate disclosures.

On June 10, 2011, CVCI and Ness issued a joint press release announcing that they had entered into a definitive merger agreement (the "Merger Agreement") for CVCI to acquire Ness, in a deal valued at $307 million (the "Proposed Acquisition"). Complaint, ¶1. Under the terms of the Merger Agreement, holders of Ness common stock will receive $7.75 in cash for each share of common stock they hold. Complaint, ¶2.

The Schedule 14A Preliminary Proxy Statement filed with the U.S. Securities and Exchange Commission ("SEC") on June 30, 2011 (the "Proxy") is inadequate, incomplete, and misleading. Among other deficiencies, the Proxy fails to disclose the following:

- Among other things, the Proxy does not describe in sufficient detail the sales process leading up to the Proposed Acquisition or the flaws that might have permeated the sales process. For example, there is no explanation why Bidder D is accusing Ness of violating its exclusivity and confidentiality agreements, or the specific accusations made by Bidder D in the letter dated June 27, 2011. Proxy, pp. 5, 57

- The underlying methodologies, projections, key inputs and multiples relied upon and observed by Jefferies & Company, Inc. ("Jefferies"), who acted as the financial advisor to the Special Committee, and Merrill Lynch, Pierce, Fenner & Smith Incorporated ("BofA Merrill Lynch") who acted as financial advisor to the

Board, in its analyses and in support of its fairness of the Proposed Acquisition, which are necessary for shareholders to evaluate and properly assess the credibility of the various analyses performed by Jefferies and BofA Merrill Lynch and relied upon by the Board in recommending the Proposed Acquisition.  Proxy, pp. 37-47

- In addition, while the Proxy discloses certain Company projections at page 48, it fails to disclose Ness' unlevered free cash flows or even the key inputs necessary to reach free cash flows, which are critical to understanding the basis for those projections as well as the projections for years 2011-2015 used by both Jefferies and BofA Merrill Lynch in its analyses.

Complaint, ¶¶66-69.  Without the foregoing disclosures and additional material information, Plaintiff and other similarly situated shareholders will be unable to evaluate and properly determine whether the Proposed Acquisition is the result of a fair and thorough process, which the current stock price in excess of the Proposed Acquisition price would indicate it can't be the result of a fair process.

At present, however, all of the evidentiary facts with respect to the proposed acquisition are in the hands of the various Defendants.  Plaintiff seeks expedited discovery with respect to these issues, and the other issues raised in the Complaint, so that he can make a properly supported application for a preliminary injunction after discovery has been completed.

2

## FACTUAL BACKGROUND

**A.**   **Ness' Bright Prospects For The Future**

Ness is a global provider of information technology, or IT, and business services and solutions with specialized expertise in software product engineering, system integration, application development, consulting and software distribution. Complaint, ¶35. The primary industries, or verticals, the Company serves include high-tech companies and independent software vendors, or ISVs; utilities and public sector; financial services; defense and homeland security; and life sciences and healthcare.  Ness has operations in North America, Europe, Israel and India, serving customers in over 20 countries. *Id.*

Ness provides services to over 500 clients located throughout the world, including a number of Fortune 1000 and Global 2000 companies. Ness has achieved recurring revenues from multi-year contracts and long-standing relationships with clients such as Chordiant (Pegasystems), the Czech Office for Surveying, Mapping and Cadastre, Komercní Banka, Israel Aircraft Industries, Israel's Ministry of Defense, Kaiser Permanente, Lockheed Martin, NAVTEQ, Quintiles, Standard & Poor's and Telefónica O2. Complaint, ¶36.

The Company's revenues have grown from $161.4 million in 2002 to $571.8 million in 2010, representing a compound annual growth rate of approximately 17%, while results of operations have improved from net income from continuing operations of $0.7 million for 2002 to $30.5 million for 2008.  Complaint, ¶37.

This highly favorable financial performance continued into 2011.  For example, on January 31, 2011, the Company announced that its Software Product Labs business unit had signed an extension of its development contract with NAVTEQ, the leading global provider of maps, traffic and location-data-enabling navigation, location-based services and mobile

advertising around the world.  The Company reported that the new three year deal extends and expands the large global development center in Košice, Slovakia. Complaint, ¶38.

Commenting on this development contract with Ness, Amreesh Modi ("Modi"), Chief Technology Officer and Executive Vice President, NAVTEQ, stated, in relevant part:

> We are extremely pleased with the level of technical excellence and results the Ness team has delivered over the past three years. Ness' Košice center provides us with the right mix of skills and resources to meet our requirements for high quality, creativity and innovation. We look forward to our continued collaboration.

Complaint, ¶39.

Similarly, on February 14, 2011, Ness announced that its defense and homeland security business unit had signed a $16 million contract to provide a training and simulation system to a foreign country's national command and control center.  The Company reported that the solution will be based on Ness' sophisticated Integrated Command and Control System, which Ness implemented for the purchasing country beginning in May 2008, and a simulation product. ¶40.

Again, on March 15, 2011, the Company announced that it won another contract – this one with Barclays Capital, the investment banking division of Barclays Bank PLC, to establish an Israel Development and Engineering Center.  The Company reported that the center will provide technology development and engineering services.  The contract is expected to be worth more than $75 million over five years. ¶42.

On April 13, 2011, the Company announced it was awarded another $17.3 million engagement from Israel Electric Corporation to implement SAP-based projects, including software testing.  In announcing the contract, Effi Kotek, President of Ness Israel boasted:

> We will provide IEC, which is a strategic client, with our extensive experience and expertise in the utilities industry, including experts from Israel as well as from our subsidiaries in Eastern Europe, where we routinely conduct similarly complex projects for European utilities companies.  IEC's selection of Ness for these

important projects underscores our position as Israel's leading SAP systems integrator and implementer.

Complaint, ¶44.

Based upon the strategic initiatives adopted by the Company in 2009, as well as the new contracts awarded to the Company, Ness's financial prospects are extremely promising.  On February 2, 2011, the Company announced financial results for its fourth quarter and full year, ended December 31, 2010.  Complaint, ¶45. Ness reported that quarterly revenues were a record $157.4 million, up 16% year-over-year; and full year revenues were $571.8 million, up 12% year-over-year.  *Id.* The Company further reported a profit of $7.3 million, compared to a loss of $11.3 million in the fourth quarter of 2009; and full year profit of $16.4 million, up from $0.3 million in 2009.   Moreover, the Company reported that on a non-GAAP basis, quarterly operating income was $10.1 million, up 87% year-over-year; and full year operating income was $27.7 million, up 11% year-over-year.  Furthermore, on both a GAAP and non-GAAP basis, the Company reported that quarterly operating income and operating margin improved sequentially, reaching the highest levels achieved in nine quarters.  *Id.*

On May 4, 2011, Ness announced financial results for its first quarter, ended March 31, 2011.  Complaint, ¶48. The Company reported that revenues were $137.3 million, up 3% year-over-year; and operating income was $6.9 million, up 186% year-over-year.  *Id.*  The Company stated that, on a non-GAAP basis, operating income was $8.9 million, up 79% year-over-year.  Additionally, on a GAAP and non-GAAP basis, the Company reported that operating margin improved sequentially, reaching the highest levels in ten quarters.  *Id.*  Further, the Company stated that net income from continuing operations was $4.2 million, up 497% year-over-year.  *Id.* Based upon these results, the Company Ness reiterated its full year 2011 guidance for revenues

from continuing operations in the range of $595 million to $605 million, up from the $571 million in revenues reported for 2010.  *Id.*

Commenting on these first quarter 2011 results and the success of the Company's strategic initiatives, Defendant Gerlitz stated:

> We had a good first quarter and I am very proud of the continued operating margin expansion we delivered. Our steady progress improving operating margins is a direct result of record first quarter results in Israel as well as ongoing improvement in Central and Eastern Europe. ***We are making excellent headway on the strategic integration of our business units into one global entity***, as manifested by our recent landmark contract with Barclays Capital. ***We are confident about the year ahead, and look forward to further improvements in our results.***

Complaint, ¶49.

Rather than permitting the Company's shares to continue to trade freely and allowing its public shareholders to reap the benefits of the Company's strategic initiatives and integration which were already producing increasingly positive financial results and poised the Company for "further improvements" in the coming year, the Individual Defendants have acted for their own benefit and the benefit of CVCI, and to the detriment of the Company's shareholders, by entering into the Merger Agreement.  The Individual Defendants effectively capped Ness's price at a time when the Company's stock was overcoming the effects of the lingering economic recession and when it was poised to capitalize on its positive and encouraging financial outlook. Complaint, ¶50.

**B.      The Proposed Acquisition**

On June 10, 2011, Ness issued a press release announcing the Proposed Acquisition which stated:

> **Teaneck, NJ – June 10, 2011** – Ness Technologies, Inc. (NASDAQ: NSTC and TASE: NSTC), a global provider of information technology solutions and services, announced today that the company has entered into a definitive merger

6

agreement under which an affiliate of Citi Venture Capital International (CVCI), a global private equity investment fund, will acquire the company in an all-cash transaction valued at approximately $307 million.

Under the terms of the agreement, Ness stockholders will receive $7.75 per share in cash for each share of common stock they hold, representing a premium of 17.6% over the closing price of the company's shares on the Nasdaq Global Select Market on June 9, 2011, the last trading day prior to today's announcement, or 22.2% over the average closing price of the company's shares over the 30 trading days prior to June 10, 2011.

The company's Board of Directors, acting upon the unanimous recommendation of a Special Committee of disinterested members of the company's Board of Directors, approved the transaction as being in the best interests of Ness Technologies and its stockholders and recommends that the company's stockholders approve the transaction.

"We believe this transaction provides attractive value for our stockholders and represents an exciting opportunity for Ness, our over-500 customers and our 6,900 employees to continue our growth and development in partnership with CVCI," said Sachi Gerlitz, president and CEO, Ness Technologies. "We look forward to completing the transaction and continuing to provide superior solutions and services to our strong customer base, as we build upon our leadership position in our markets and continue to implement our strategic plan."

"We are excited about the prospect of increasing our investment in Ness," said Bob Khanna, CVCI's Managing Director. "Ness is the leader in several segments of the IT services marketplace, serves the most sophisticated global clients and has an outstanding reputation for delivering complex projects. We look forward to working with management, employees and partners of all business units to ensure that Ness becomes even more valuable to its clients and fully leverages the strengths of its global network."

P. Howard Edelstein, Chairman of the Special Committee, said: "After a thorough assessment, we concluded that the transaction with CVCI delivers significant value and is in the best interest of our stockholders."

The transaction is subject to certain closing conditions, including approval of the company's stockholders, antitrust regulatory approvals and other customary closing conditions. Ness's stockholders will be asked to vote on the proposed transaction at a special meeting that will be held on a date to be announced. Ness expects the transaction to be completed in the next three to six months.

Jefferies & Company, Inc. is acting as financial advisor to the Special Committee, and managed the process for the Special Committee soliciting bids from both strategic and financial sponsors in response to an unsolicited indication of interest.

BofA Merrill Lynch is acting as financial advisor to the Board of Directors of Ness. Citigroup Global Markets Inc. is acting as financial advisor to CVCI. Olshan Grundman Frome Rosenzweig & Wolosky LLP is acting as legal advisor to Ness, Ropes & Gray LLP is acting as legal advisor to the Special Committee and Cleary Gottlieb Steen & Hamilton LLP is acting as legal advisor to CVCI.

Complaint, ¶51.

## C.   The Proxy Is Materially Deficient And Incomplete

The Complaint alleges, *inter alia,* that the Proxy is deficient in that it fails to provide Ness' shareholders, such as Plaintiff, with material information, and/or provides them with materially misleading information, with the result that shareholders are unable to make an informed decision on whether to vote their shares in support of the Proposed Acquisition. Complaint, ¶64. This omitted information, if and when disclosed, would significantly alter the totality of information available for consideration by the average Ness shareholder and, as such, if Ness shareholders are asked to eventually vote based solely upon these inadequate disclosures, they will be irreparably harmed. Complaint, ¶65.

Among the apparent deficiencies in the preliminary proxy statement are:

- The Proxy Statement does not describe in sufficient detail the sales process leading up to the Proposed Acquisition or the flaws that might have permeated the sales process. For example, there is no explanation why Bidder D is accusing Ness of violating its exclusivity and confidentiality agreements, or the specific accusations made by Bidder D in the letter dated June 27, 2011. Proxy, pp. 5, 57

- Furthermore, the underlying methodologies, projections, key inputs and multiples relied upon and observed by Jefferies in connection with the Proposed Acquisition are omitted from the Proxy. At a minimum, the Proxy should include the following information:

  o   In the *Selected Companies Analysis*, Proxy p. 39, (a) the criteria to select the companies and multiples used as well as multiples observed for each of the selected companies; (b) the selected reference ranges applied the Company's EBITDA and EPS for its trailing 12 months  as well as calendar years 2011 and 2012 in the analysis. In fact, the analysis only discloses conclusory statements by showing the implied per share equity

value for the different multiples without showing a fair summary of the analysis;

o   In the *Selected Transactions Analysis*, Proxy, p. 40, (a) the rationale for selecting companies used; (b) the multiples observed for each of the selected transactions; (c) the selected reference ranges applied the Company's 12 months trailing EBITDA. In fact, the analysis only discloses conclusory statements by showing the implied per share equity value and suffers the same infirmities as the analysis above by failing to show a fair summary of the analysis; and

o   In the *Discounted Cash Flow Analysis*, Proxy, p. 41, (a) the definition of "free cash flows"; and (b) the rationale for selecting an exorbitant discount rate of 12% to 13% and EBITDA terminal growth rates of 2% to 4% in the analysis. Moreover, the analysis is silent as to whether stock based compensation was considered and how it was allocated in the analysis;

• Similarly, the underlying methodologies, projections, key inputs and multiples relied upon and observed by BofA Merrill Lynch in connection with the Proposed Acquisition are omitted from the Proxy.  At a minimum, the Proxy should include the following information:

o   In the *Selected Companies Analysis*, Proxy, p. 43-44, (a) the criteria to select the companies and multiples used as well as multiples observed for each of the selected companies; (b) the selected reference range is disclosed here but it fails to explain it selection process to use 5.0x to 6.5x for 2011 EBITDA and 8.5 to 11.0x for 2012 EBITDA. Furthermore, the analysis discloses conclusory statements by showing the implied per share equity value for the different multiples but it is an incomplete analysis since it failed to show a fair summary of the analysis;

o   In the *Selected Transactions Analysis*, Proxy, p. 44-45, (a) the rationale for selecting companies used; (b) the multiples observed for each of the selected transactions; (c) the selected reference range is disclosed here but it fails to explain it selection process to use 6.5x to 9.0x for LTM EBITDA and 5.0x to 7.5x for NTM EBITDA. Furthermore, the analysis discloses conclusory statements by showing the implied per share equity value for the different multiples but it is an incomplete analysis since it failed to show a fair summary of the analysis;

o   In the *Discounted Cash Flow Analysis*, Proxy, p. 45, (a) the definition of "free cash flows"; and (b) the rationale for selecting an exorbitant discount rate of 13.5% to 15.5% and the terminal values used in the analysis. Moreover, the analysis is silent as to whether stock based compensation was considered and how it was allocated in the analysis;

9

- Moreover, while the Proxy Statement discloses certain Company projections at page 48, it fails to disclose Ness' unlevered free cash flows or even the key inputs necessary to reach free cash flows, which are critical to understanding the basis for those projections as well as the projections for years 2011-2015 used by both Jefferies and BofA Merrill Lynch in its analyses. This information is critical to evaluate and understand the sales process and analysis rendered in connection with the Proposed Acquisition, and thus is highly relevant and material to Plaintiff and other similarly situated Ness shareholders.

Accordingly, because the foregoing facts and material misstatements and omissions represent a violation of federal and state law, Plaintiff seeks injunctive and other equitable relief to prevent the irreparable injury that Company shareholders will continue to suffer absent judicial intervention.

<u>**LEGAL ARGUMENT**</u>

**PLAINTIFF REQUESTS EXPEDITED
DISCOVERY AND PRELIMINARY
<u>INJUNCTION SCHEDULE</u>**

Plaintiff has previously requested expedited discovery, for the reasons set forth in his July 11, 2011 letter to the Court. [Docket Entry 3]  He incorporates the reasoning set forth in that letter with respect to the continued need for expedited discovery.  Plaintiff also respectfully requests that the Court enter a briefing schedule for discovery and for the submission of a preliminary injunction application.  Set forth below are highlights of what Plaintiff believes to be inadequate disclosures[1] in the preliminary Proxy Statement relating to the proposed acquisition of Ness by CVCI, and why those inadequate disclosures are material to shareholders to they may make a fully informed decision with respect to the proposed transaction.

a)      **The Inadequate Disclosures In the Preliminary Proxy Statement
        <u>Are Material Under Delaware Law</u>**

Ness is a Delaware corporation, thus, the substantive law of Delaware applies to determine whether a preliminary injunction should be ordered.[2]  Under Delaware law, "[a] preliminary injunction motion is . . . the appropriate mechanism by which to challenge alleged disclosure violations[,]" *Wayne County Emples. Ret. Sys. v. Corti*, 954 A.2d 319, 329 (Del. Ch. 2008), as well as a board's failure to engage in a process designed to maximize shareholder value.  *See In re Netsmart Techs., Inc. S'holders Litig*., 924 A.2d 171 (Del. Ch. 2007).

---

[1]      These are an overview of inadequate disclosures just from the face of the preliminary proxy statement.  Discovery may reveal more or different disclosures in the proxy statement which require further disclosure.

[2]      Because Ness is incorporated in Delaware, Delaware substantive law applies to the underlying legal requirements of establishing an entitlement to injunctive relief.

Under Delaware law, shareholders are entitled to the full and accurate disclosure of all material facts before making a decision as to a significant corporate transaction. *See*, *e.g.*, *Shell Petroleum, Inc. v. Smith*, 606 A.2d 112, 114 (Del. 1992); *Stroud v. Grace*, 606 A.2d 75, 84-5 (Del. 1992). Moreover, once a company makes a disclosure, it must do so candidly and truthfully. *Freedman v. Restaurant Assocs. Indus., Inc.,* No. 9212, 1990 Del. Ch. LEXIS 142, at *15 (Del. Ch. Sept. 19, 1990) (purpose of transaction had to be disclosed "truthfully and candidly"). Thus, "[w]hen a document ventures into certain subjects, it must do so in a manner that is materially complete and unbiased by the omission of material facts." *In re Pure Resources, Inc. S'Holders Litig*, 808 A.2d 421, 448 (Del. Ch. 2002); *see also Arnold v. Soc'y for Sav. Bancorp., Inc.*, 650 A.2d 1270, 1280 (Del. 1994) (partial disclosure of historical events leading up to merger triggered duty to disclose).

In evaluating claims of inadequate disclosure, the primary inquiry concerns the materiality of the alleged omissions. *McMullin v. Beran*, 765 A.2d 910, 925 (Del. 2000). "The materiality standard requires that directors disclose all facts which, 'under all the circumstances, ... would have assumed actual significance in the deliberations of the reasonable shareholder.'" *Id.*, 765 A.2d at 925 (quoting *TSC Indus. v. Northway, Inc.*, 426 U.S. 438, 449 (1976)). However, "'[t]his [materiality] standard ... does not require proof of a substantial likelihood that disclosure of the omitted fact would have caused the reasonable investor to change his vote.'" *Rosenblatt v. Getty Oil Co.*, 493 A.2d 929, 944 (Del. 1985) (quoting *TSC*, 426 U.S. at 449). Here, as alleged in the Complaint, Defendants have failed to disclose all material information that Plaintiff and other Ness shareholders Delaware law deems to be important information to know before voting on the Proposed Acquisition.

It is fundamental that shareholders have a right to all material information prior to a shareholder vote. *Arnold*, 650 A.2d at 1277. This includes a fair summary of a financial advisor's analyses and the projections used in performing those calculations. *See Pure Resources*, 808 A.2d at 449.

> [S]tockholders are entitled to a fair summary of the substantive work performed by the investment bankers upon whose advice the recommendations of their board as to how to vote on a merger or tender rely… [T]he disclosure of the banker's "fairness opinion" alone and without more, provides stockholders with nothing other than a conclusion, qualified by a gauze of protective language designed to insulate the banker from liability.

> The real informative value of the banker's work is not in its bottom-line conclusion, but in the valuation analysis that buttresses that result.

*Id*.

### 1) <u>Free Cash Flow for Ness Must Be Disclosed</u>

Financial projections are routinely included in disclosure materials. For example, in *Netsmart*, the court held that the disclosures were materially incomplete where they failed to disclose the projections used to perform the discounted cash flow analysis. *In re Netsmart Technologies, Inc. S'holders Litig.,* 924 A.2d 171, 200-203 (Del. Ch. 2007). The court stated:

> Once a board broaches a topic in its disclosures, a duty attaches to provide information that is "materially complete and unbiased by the omission of material facts." For this reason, when a banker's endorsement of the fairness of a transaction is touted to shareholders, the valuation methods used to arrive at that opinion **as well as the key inputs and range of ultimate values generated by those analyses must also be fairly disclosed.** Only providing some of that information is insufficient to fulfill the duty of providing a "fair summary of the substantive work performed by the investment bankers upon whose advice the recommendations of the board as to how to vote . . . rely."

*Id.* at 203-204 (emphasis added).

Courts have repeatedly emphasized the important role that financial projections prepared by management play in a shareholder's decision regarding a Proposed Acquisition. *See, e.g., In re PNB Holding Co. S'holders Litig.*, 2006 Del. Ch. LEXIS 158, at *58 (Del. Ch. Aug. 18, 2006)

13

("[R]eliable management projections of the company's future prospects are of obvious materiality to the electorate.  After all, the key issue for the stockholders is whether accepting the Proposed Acquisition price is a good deal in comparison with remaining a shareholder and receiving the future expected returns of the company."); *In re Staples, Inc. S'holders Litig.*, 792 A.2d 934, 958 n.44 (Del. Ch. 2001) ("the projections are the information that most stockholders would find the most useful to them.").  The Proxy has failed to disclose the complete set projections for Ness as required by law and explained in further detail below.

The Delaware Court of Chancery has held that free cash flow projections are "clearly material."  *Maric Capital Master Fund, Ltd. v. Plato Learning, Inc.*, 11 A.3d 1175, 1178 (Del. Ch. 2010) ("the proxy statement selectively disclosed projections relating to PLATO's future performance.  In particular, the proxy statement for some inexplicable reason excised the free cash flow estimates.  This is odd... in my view, management's best estimate of the future cash flow of a corporation that is proposed to be sold in a cash merger is clearly material information.").

Here, the free cash flows are the basis for the discounted cash flow projections which appear in the proxy statement.  However, without the fee cash flows, it is impossible to determine whether the discounted cash flows are reasonable or accurate.  As a result, that cash flow information should  be disclosed in advance of the shareholder vote so that the Company's shareholders can answer for themselves the fundamental question that will determine their vote on the Proposed Acquisition: "is the price being offered now fair compensation for the benefits I will receive as a stockholder from the future expected cash flows of the corporation if the corporation remains as a going concern?"  *Id.* at 1178 ("The trade off here is that PLATO's

stockholders can get $5.60 for sure, but must forsake the value that might obtain if the corporation remains independent and delivers on management's expected cash flows.").

> **2)  Key Inputs for Jefferies and
> BofA Merrill Lynch's Analyses Must Be Disclosed**

A fair summary of a financial advisor's analyses also needs to be disclosed to shareholders.  *See In re Pure Res. S'holders Litig.,* 808 A.2d 421, 449 (Del. Ch. 2002).   In several instances as stated above, the Proxy fails to disclose key inputs and assumptions underlying the analyses performed by Jefferies and/or BofA Merrill Lynch in connection with their finesses opinions, making it impossible for shareholders to draw any conclusions as to the reliability of Jefferies and/or BofA Merrill Lynch's analyses.   For example, the Proxy only discloses conclusory statements for Jefferies analysis by showing the implied per share equity value for the different multiples without showing a fair summary of the analysis in contravention to the legal standards of disclosure.   Similarly, the Proxy discloses the analysis for BofA Merrill Lynch's and attempt to provide a little more disclosure then Jefferies by disclosing at least the reference range for certain multiples in the analysis, but continues to fall short from providing a fair summary as required by the legal standards of disclosure.

Most troubling, as described above, certain Company projections are disclosed on page 48 of the Proxy, but the Proxy fails to disclose Ness's unlevered free cash flows or even the key inputs necessary to reach free cash flows, which form the basis for the discounted cash flow projections.   The free cash flow projections are critical to understanding the basis for the discounted cash flow projections as well as the projections for years 2011-2015 used by Jefferies and BofA Merrill Lynch in their analyses and required by recent developments in Delaware law such as the decision in *Plato Learning*.   Key inputs including financial data and projections provided by management and utilized by the company's financial advisor constitutes material

information, and failure to disclose those estimates warrants temporarily enjoining the shareholder vote regarding the Proposed Acquisition.  *See In re Netsmart*, 924 A.2d 171 (enjoining merger pending corrective disclosures, including disclosure of final revenue, earnings, and free cash flow estimates used by the company's financial advisor).

It is fundamental that shareholders have a right to all material information prior to a shareholder vote.  *Arnold*, 650 A.2d at 1277.  This includes a fair summary of a financial advisor's analyses and the projections used in performing those calculations.  *See Pure Resources*, 808 A.2d at 449.

> [S]tockholders are entitled to a fair summary of the substantive work performed by the investment bankers upon whose advice the recommendations of their board as to how to vote on a merger or tender rely… [T]he disclosure of the banker's "fairness opinion" alone and without more, provides stockholders with nothing other than a conclusion, qualified by a gauze of protective language designed to insulate the banker from liability.
>
> The real informative value of the banker's work is not in its bottom-line conclusion, but in the valuation analysis that buttresses that result.

*Id.*

Accordingly, the key inputs requested in the Amended Complaint, including the multiples observed by Jefferies and BofA Merrill Lynch in its analyses, must be disclosed.

### 3)   <u>Details of the Sales Process</u>

"When directors describe their decision-making process leading up to a merger, they must do so in a fair and balanced way."  *In re Netsmart,* 924 A.2d at 209 n.120; *see also Malone v. Brincat*, 722 A.2d 5, 12 (Del. 1998); *Arnold,* 650 A.2d at 1280-82.  Here, Defendants failed to disclose material details of the sales process, including:  an adequate explanation as to why the Board chose to abandon negotiations with Bidder D and instead rejected any further consideration of its proposal and more troubling why Bidder D is accusing Ness of violating its

16

exclusivity agreement and confidentiality agreement and the specific accusations made by Bidder D in its letter dated June 27, 2011, which is not even attached to the Proxy Statement.

**b)      Shareholders Will Suffer Significant
And Irreparable Injury Without Adequate Disclosures**

It is well settled that irreparable harm exists when uninformed shareholders are asked to vote in favor of a change-in-control transaction.  *See ODS Techs., L.P. v. Marshall*, 832 A.2d 1254, 1262 (Del. Ch. 2003); *In re Pure Res.,* 808 A.2d at 452-53.  In such circumstances, it is appropriate for a court to address material disclosure problems through the issuance of a preliminary injunction that persists until the problems are corrected to avoid having to "'unscramble the eggs'" following the completion of an infirm shareholder vote.[3]   If the shareholder vote goes forward without complete and accurate disclosures with respect to the proposed acquisition, money damages will not compensate the shareholders for their voting on the acquisition based upon inadequate information.  Vindication of the recognized right to cast an informed decision "requires a specific remedy such as an injunction, rather than a substitutionary remedy such as damages."  *Gilmartin v. Adobe Resources Corp.*, 1992 Del. Ch. LEXIS 80, at *43 (Del. Ch. Apr. 6, 1992); *Eisenberg*, 537 A.2d at 1051; *Joseph v. Shell Oil Co.*, 482 A.2d 335, 344 (Del. Ch. 1984).  No other right would be effective, as once the Proposed Acquisition is consummated, the merger cannot easily be undone.  In this case, Defendants'

---

[3]      *See, e.g.*, *McMillan v. Intercargo Corp.*, 768 A.2d 492, 500 (Del. Ch. 2000) ("the metaphorical merger eggs have been scrambled"); *Michigan Citizens for an Indep. Press v. Thornburgh*, 1988 U.S. Dist. LEXIS 16576, at *18 (D.D.C. Aug. 17, 1988) (finding irreparable injury from merger because consolidation would make it "very difficult to reassemble this egg once it has been scrambled"); *Phototron Corp. v. Eastman Kodak Co.*, 687 F. Supp. 1061, 1071 (N.D. Tex. 1988) ("physical assets sold, and commercial arrangements permanently altered . . . [are] the sort of 'scrambled eggs' that cannot be 'unscrambled' through monetary damages"), *rev'd on other grounds*, 842 F.2d 95 (5th Cir. 1988); *Laidlaw Acquisition Corp. v. Mayflower Group, Inc.*, 636 F. Supp. 1513, 1517 (S.D. Ind. 1986) ("The virtual impossibility of 'unscrambling the scrambled eggs,' once these parties are joined in corporate (shotgun) matrimony ... constitutes ... irreparable harm ....").

failure to disclose material information as to the financial aspects of the proposed transaction, which impact whether the transaction is in the shareholders' best interests, would warrant the issuance of a preliminary injunction to postpone holding the shareholder vote on the Proposed Acquisition.

As the *NetSmart* court stated:

> [T]his court has typically found a threat of irreparable injury to exist when it appears stockholders may make an important voting decision on inadequate disclosures. By issuing an injunction requiring additional disclosure, the court gives stockholders the choice to think for themselves on full information, thereby vindicating their rights as stockholders to make important voting and remedial decisions based on their own economic self-interest.

*Id.*, 924 A.2d at 207.

**c)      The Harm to Shareholders Outweighs
         <u>Any Hypothetical Harm To Defendants Or Any Third Parties</u>**

In the event an injunction were to issue, there would be no hardship to Defendants.  *See In re Staples,* 792 A.2d at 960 ("[O]ur cases recognize that it is appropriate for the court to address material disclosure problems through the issuance of a preliminary injunction that persists until the problems are corrected.   An injunctive remedy of that nature specifically vindicates the stockholder right at issue – the right to receive fair disclosure of the material facts necessary to cast a fully informed vote – in a manner that later monetary damages cannot and is therefore the preferred remedy, where practicable"); *see also State of Wisconsin Inv. Bd. v. Bartlett*, 2000 Del. Ch. LEXIS 22 (Del. Ch. Feb. 9, 2000) (noting that hardships suffered by defendant by delay of vote were *de minimis* when compared to the possibility that the shareholders voted on the extinction of their corporation with less than all the material reasonably available to them); *In re Anderson, Clayton S'holders Litig.*, 519 A.2d 669, 676 (Del. Ch. 1986) (recognizing, in balancing harm, that "delay in any large transaction may involve risks

of employee agitation or market fluctuations," but finding those factors not "especially significant" in view of the "fundamental importance" of the transaction "and its likely long-term consequences").

Indeed, if an injunction is necessary, postponement of distributing the Proxy and the inherent delay in consummating the proposed acquisition would be beneficial to Defendants, since it gives them time to correct their inadequate disclosures and allow shareholder approval of the transaction based upon complete and accurate information to the shareholders.  *See NetSmart*, 924 A.2d at 207-08 ("By this approach, the court also ensures that greater effect can be given to the resulting vote down the line, reducing future litigation costs and transactional and liability uncertainty.").  As the court in *Gilmartin* noted:

> To allow the merger to go forward would deprive the ... [s]tockholders of [the right to full disclosure], whereas a preliminary injunction for a brief period to enable the defendants to make corrective disclosure is the remedy most likely to vindicate that right.

1992 Del. Ch. LEXIS 80, at *43.

**CONCLUSION**

For the foregoing reasons, Plaintiff's application for expedited discovery and for a schedule for filing a preliminary injunction application should be granted.

CARELLA, BYRNE, CECCHI,
OLSTEIN, BRODY & AGNELLO, P.C.
Attorneys for Plaintiff


By:___/s/ James E. Cecchi_____
    JAMES E. CECCHI

Dated: July 15, 2011

Nadeem Faruqi
Shane Rowley
Juan E. Monteverde
Francis McConville
FARUQI & FARUQI, LLP
369 Lexington Avenue,10th Floor
New York, New York 10017
(212) 983-9330

Scott A. Bursor
BURSOR & FISHER, P.A.
369 Lexington Avenue, 10th Floor
New York, New York 10017
(212) 989-9113