# EXHIBIT C

*5492*

IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

STEAMFITTERS LOCAL UNION 447, :
on Behalf of Itself and All :
Other Similarly Situated :
Shareholders of inVentiv :
Health, Inc., :
 :
   Plaintiff, :
 :
  vs. : Civil Action
 : No. 5492-CC
R. BLANE WALTER, ERAN BROSHY, :
TERRELL G. HERRING, MARK E. :
JENNINGS, PER H.G. LOFBERG, A. :
CLAYTON PERFALL, CRAIG SAXTON, :
INVENTIV HEALTH, INC., THOMAS :
H. LEE PARTNERS, L.P., :
PAPILLON HOLDINGS, INC. AND :
PAPILLON ACQUISITION, INC., :
 :
   Defendants. :

- - -

Via telephone
New Castle County Courthouse
Wilmington, Delaware
Monday, June 21, 2010
3:34 p.m.

- - -

BEFORE: HON. WILLIAM B. CHANDLER, III, Chancellor.

- - -

RULING ON MOTION TO EXPEDITE

- - -

CHANCERY COURT REPORTERS
500 North King Street - Suite 11400
Wilmington, Delaware 19801-3759
(302) 255-0525

2

1    APPEARANCES:

2            SIDNEY S. LIEBESMAN, ESQ.
             Labaton & Sucharow LLP
3               for Plaintiff Steamfitters Local Union 449
                      -and-
4            EDUARD KORSINSKY, ESQ.
             SHANNON L. HOPKINS, ESQ.
5            of the New York Bar
             Levi & Korsinsky, LLP
6               for Plaintiff Samuel Ramage

7            RAYMOND J. DiCAMILLO, ESQ.
             KEVIN M. GALLAGHER, ESQ.
8            Richards, Layton & Finger, P.A.
                      -and-
9            BRIAN P. MILLER, ESQ.
             of the Florida Bar
10           Akerman Senterfitt
                for Defendants inVentive Health, Inc., Eran
11              Broshy, Terrell G. Herring, Mark E. Jennings,
                Per G.H. Lofberg, A. Clayton Perfall, Craig
12              Saxton and R. Blane Walter

13           KEVIN G. ABRAMS, ESQ.
             Abrams & Bayliss LLP
14                    -and-
             JOHN D. DONOVAN, JR., ESQ.
15           Of the Massachusetts Bar
             Ropes & Gray LLP
16              for Defendants Thomas H. Lee Partners, L.P.,
                Papillon Holdings, Inc. and Papillon
17              Acquisition, Inc.

18                         -  -  -

19

20

21

22

23

24

                                                                    3

 1                    THE COURT:  Good afternoon, counsel.
 2                    MR. LIEBESMAN:  Good afternoon, Your
 3   Honor.
 4                    THE COURT:  I have the list of, I
 5   believe, everyone on the line.  Most importantly I
 6   want to confirm that the court reporter is on the line
 7   with us.
 8                    (A brief discussion was held off the
 9   record.)
10                    THE COURT:  Thank you, Mr. Dawson, for
11   being available.  Thank you, counsel, for being
12   available, as well.
13                    I had the chance over the weekend to
14   review the transcript of the argument from last week
15   on the motion to expedite.  In addition, I am sorry I
16   imposed on your weekends, because I can tell that you
17   were working, because I read the letter from
18   Mr. DiCamillo and Mr. Abrams.  And then,
19   Mr. Liebesman, I got your letter in response to that.
20                    Although I really wasn't inviting
21   reargument, I didn't mind getting your letters, and I
22   appreciate the effort that went into doing that,
23   providing that extra help to me.  And so what I wanted
24   to do now is just give you the benefit of my thinking

4

1   on what we should do.

2                    There really are, for purposes of the

3   motion to expedite, I think, at least as I gather from

4   the latest written submissions, two principal grounds

5   for seeking expedited discovery and scheduling of a

6   preliminary injunction hearing before the July 21 vote

7   on this transaction.  I recognize, Mr. Liebesman, you

8   are not conceding anything, or you are not waiving

9   anything or disclaiming anything.

10                   Those two grounds are, first, what I

11  will call the relationships argument, the argument

12  that the nature of certain business relationships

13  between Mr. Broshy and Mr. Jennings and Mr. Perfall,

14  who are directors on the board -- and Mr. Perfall and

15  Mr. Jennings, of course, were the special committee

16  members -- and Mr. Broshy, and his role at Providence

17  Equity, and the relationships and connections with

18  certain transactions that those folks are involved in,

19  involving companies that Mr. Jennings works at, also

20  involving connections or relationships with Goldman

21  Sachs, which is performing advisory work, I guess, in

22  some other cases or other transactions or deals that

23  Mr. Broshy, Jennings and Perfall are involved in --

24  that all of those relationships somehow have

5

1    influenced the special committee's decision, and the

2    board of directors' decision, at inVentiv to recommend

3    and approve this going-private transaction proposed by

4    Thomas H. Lee, that is going to be voted on on

5    July 21.

6                    Now, that argument, as I thought about

7    it over the weekend and as I looked and read the

8    definitive proxy statement and as I looked again and

9    read carefully the amended complaint in this matter --

10   it seems to me the more I read it, that that is --

11   although framed as a disclosure issue, it can be

12   understood differently.  And for my purposes, I think

13   what it really is alleging is some type of conspiracy

14   amongst certain directors on the board of inVentiv to

15   recommend this transaction, perhaps because

16   consideration was being given in other transactions

17   that would compensate for whatever lack of

18   consideration was being put on the table by Thomas H.

19   Lee in this case.

20                   And so the theory of this claim or

21   this argument seems to be that this web of

22   relationships between Broshy, Perfall, Jennings,

23   related entities, and Goldman Sachs resulted in the

24   inadequate offering price of $26 a share in this case.

1    That is the claim or the theory.

2                    I will say, in fairness to the

3    defendants, it's very thinly pled and thinly alleged,

4    but it's there.  But to the extent that it is there, I

5    think it gives rise to a claim of breach of loyalty.

6    It's not a breach of due care on behalf of these

7    directors that is being alleged.  It's really a breach

8    of the duty of loyalty.  For that reason, there would

9    be no impediment to this Court after the fact awarding

10   monetary damages as a remedy, if that type of breach

11   and that type of conduct is actually proven by a

12   preponderance of the evidence and can be demonstrated.

13                   So effectively, my decision is that

14   there is no threat of irreparable harm, because there

15   is the opportunity to remedy it after the fact.  There

16   is a complaint.  It's alleged in the complaint.  And

17   if it's proven later, then there will be a way for the

18   Court to see to it that those who were guilty of that

19   conspiracy would pay damages in an amount sufficient

20   to compensate the shareholders for the loss that they

21   suffered.

22                   So I don't believe there is a basis on

23   which I would accelerate or direct that there be

24   expedited proceedings based on that claim, which was

7

1   the one that Mr. Liebesman really argued to me

2   principally the last time.  Over the weekend and

3   today, the argument has shifted a little bit -- or not

4   shifted, but has grown -- to include the argument that

5   the definitive proxy fails to include information

6   regarding free cash flows at inVentiv that would

7   enable stockholders to be able to better calculate

8   whether the company has a brighter future as a going

9   concern and they ought to vote against this

10  transaction, or whether in fact the company is worth a

11  lot more than the $26 being offered by Thomas H. Lee,

12  and they ought to therefore seek appraisal.

13              And it is true, of course, that

14  disclosure claims are considered almost per se

15  irreparable, and therefore, if there is a colorable

16  claim of a disclosure violation, this Court will

17  almost always order expedited proceedings, so that it

18  might address that problem before the fact, and

19  provide a meaningful remedy for it by ordering

20  additional disclosure, if that is what the Court

21  ultimately concludes is proper to do.

22              The difficulty here is that I have

23  read the definitive proxy, and I have read the

24  arguments of counsel about the disclosures that are in

CHANCERY COURT REPORTERS

8

1    it regarding Goldman Sachs' valuation methodologies.

2    Having read those summaries of what Goldman Sachs did

3    here, and its recommendation, I would agree with

4    plaintiffs that free cash flow information would

5    certainly add to the total mix of information that is

6    available to stockholders in the definitive proxy

7    about how Goldman Sachs came to its ultimate

8    conclusion about this price, but I don't believe --

9    and on this score, I guess I agree with the

10   defendants -- that it would meaningfully alter the

11   total mix of information that is available through the

12   definitive proxy on that point.

13              The plaintiffs have argued to me that

14   this really is required or is necessary in order to

15   satisfy the holdings that this Court has issued in the

16   past about the importance of free cash flow

17   information in providing material information to

18   shareholders, so that they can understand the value of

19   their assets.  And they point to Netsmart and the

20   recent Maric decision by Vice Chancellor Strine.  And

21   there are other decisions by other members of the

22   Court that hold to the same effect.

23              But this isn't a case where free cash

24   flow estimates were deliberately removed or excised

CHANCERY COURT REPORTERS

9

1    from a proxy disclosure.  Unlike in Maric, in this

2    case no free cash flow estimates were actually

3    provided to Goldman Sachs.  The internal analyses that

4    were approved by management for Goldman's use in this

5    case didn't have a line item for free cash flow

6    estimates, and so unlike the Maric decision, there was

7    no deliberate excising of free cash flow numbers.  And

8    in addition, this isn't like Netsmart, where

9    management undertook to disclose certain projections

10   but then disclosed projections that were actually

11   stale and not, therefore, meaningful.  The proxy here

12   gave management's projections that were actually used

13   by Goldman, and those projections included net

14   revenue, net income, EPS and EBITDA estimates for five

15   years.

16                 So based on all of that, there doesn't

17   appear to me to be a colorable claim of a

18   misrepresentation or omission of material information

19   that would alter the total mix of information already

20   available to the stockholders.  And so for that

21   reason, I am not convinced that there is a colorable

22   claim of a disclosure violation that would warrant

23   expedition based on the particular facts that were

24   disclosed here, and that were used by Goldman Sachs in

10

1    arriving at its ultimate conclusions.

2                    Now, having said all of that, and with

3    due respect to Mr. Liebesman, who I know disagrees

4    with me -- and I appreciate that, and respect his

5    point of view, and can understand his point of view,

6    frankly.  And so I am quite willing, if Mr. Liebesman

7    believes that I have erred and that there are truly

8    reasons why in every case Delaware ought to require --

9    even if management hasn't produced it to the

10   investment advisor -- that Delaware law ought to

11   require as a per se rule that free cash flow estimates

12   going out into the future be provided, disclosed, I

13   would be, in the interests of clarification of

14   Delaware law, and in the interests of perhaps leading

15   to the creation of a bright-line rule in disclosure,

16   which I think would be a good thing in some ways -- I

17   would be happy, Mr. Liebesman, to sign, today, an

18   order certifying an interlocutory appeal to the

19   Delaware Supreme Court on this question.  I would even

20   go so far as to include the other question or bases

21   for your request for expedition, on the alleged

22   conflict of interest and the interrelationships of the

23   various directors of inVentiv that you raised.

24                    So if that would be of interest to

11

1   you, I can tell you I would be willing to sign an

2   order, and I would waive all of the time requirements

3   under the Supreme Court's rule with respect to

4   submission of argument on this point, and do that

5   today because of the expedited nature of this matter.

6   I realize you might want to think about that and not

7   give me an instant answer, so I'm not trying to put

8   you on the spot immediately.  I'm just telegraphing to

9   you what my predisposition is on it, should you

10  conclude that you want to seek review of my ruling.

11              MR. LIEBESMAN:  I appreciate that,

12  Your Honor.  I think that it is something that I

13  should put some thought into, although I understand

14  the time restriction and would factor that in and tell

15  the Court that if I do not get back to Your Honor

16  before the end of the day today, I will certainly by

17  tomorrow morning.

18              THE COURT:  That is fine with me,

19  Mr. Liebesman.  I appreciate that and understand it.

20  So I won't do anything until I hear from you tomorrow,

21  but for the time being, at least, I hope you

22  understand my ruling, and that's my decision for

23  today.

24              MR. LIEBESMAN:  Okay.  Thank you, Your

12

1    Honor.

2                    THE COURT:   Thank you, very much,

3    counsel, for being available.

4                    (Recess at 3:49 p.m.)

5                         -  -  -

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

13

1                          CERTIFICATE

2          I, WILLIAM J. DAWSON, Official Court Reporter

3    of the Chancery Court, State of Delaware, do hereby

4    certify that the foregoing pages numbered 3 through 12

5    contain a true and correct transcription of the

6    proceedings as stenographically reported by me at the

7    hearing in the above cause before the Chancellor of

8    the State of Delaware, on the date therein indicated.

9    The ruling was edited by the Chancellor subsequent to

10   the hearing.

11         IN WITNESS WHEREOF I have hereunto set my hand

12   at Wilmington, this 21st day of June, 2010.

13

14

15              /s/William J. Dawson
                Official Court Reporter
16                of the Chancery Court
                   State of Delaware
17

18

19

20

21

22

23

24

CHANCERY COURT REPORTERS